DAVID W. MÁRQUEZ
ATTORNEY GENERAL

Venable Vermont, Jr.
Assistant Attorney General
Office of the Attorney General
1031 W. 4th Ave., Suite 200
Anchorage, Alaska  99501
Telephone: (907) 269-5190
Fax: (907) 258-0760
Email: TWC_EFC@law.state.ak.us

Attorney for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SAMUEL KEVIN CARTER, )<br><br>Plaintiff, )<br><br>v. )<br><br>OFFICER JAMES O'MALLEY, and )<br>OFFICER TEAGUE WIDMIER, )<br><br>Defendants. )<br>———————————————) | Case No.: 4:05-cv-0016-RRB<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY** |

## INTRODUCTION

This is a 42 U.S.C. § 1983 action.  Plaintiff Carter was arrested by law enforcement officers O'Malley and Widmier and charged under state law with a drug offense.  Carter challenged the legality of the warrantless seizure of the drug paraphernalia that was the basis of the criminal charge.  The Alaska superior court found that the seizure was lawful under the "plain view" doctrine, and Carter was convicted of the crime.

However, Carter appealed, and the Alaska Court of Appeals overturned his conviction. The Court of Appeals found that the plain view doctrine did not apply because the officers were not lawfully in the position from which they observed the contraband. Carter now seeks civil damages from O'Malley and Widmier under 42 U.S.C. § 1983 for violating his Fourth Amendment rights.

O'Malley and Widmier move for summary judgment. First, O'Malley and Widmier did not violate Carter's civil rights. The trial court was correct; the seizure of Carter's drug paraphernalia was legal under the plain view doctrine. But this Court does not have to decide whether the seizure was lawful, for even if Carter's rights were violated, the officers would be entitled to qualified immunity. The trial court found after a contested suppression hearing that the officers acted lawfully. Although the Alaska Court of Appeals disagreed, there obviously was room for reasonable minds to differ. It follows that if O'Malley and Widmier violated Carter's civil rights, they made a reasonable mistake. Thus at the very least they are entitled to qualified immunity.

## STANDARDS GOVERNING SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 provides that a "party against whom a claim…is asserted…may…move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate if the court finds that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits…show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court will construe all evidence and draw all evidentiary inferences in favor of the non-moving party.[1]

A dispute over a genuine material fact exists if the evidence would allow a reasonable fact-finder to return a verdict for the non-moving party.[2] "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise proper motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."[3] The non-moving party may defeat a summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial.[4] To produce sufficient evidence, the non-moving party cannot rest solely on the allegations in the pleadings and other legal memoranda, but he must present affidavits or other admissible evidence to carry his burden.[5]

Where an official has moved for summary judgment on the basis of qualified immunity, the issue of whether the law governing the conduct at issue is clearly established is

---

[1]     10 A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2727 at 459 & n.5 (3d. ed. 1998).

[2]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3]     *Id*. at 247-48 (emphasis in original).

[4]     *Cellotex Corp. v. Katrette*, 477 U.S. 317, 322-23 (1986).

[5]     *Smith v. Mack Trucks, Inc.*, 505 F.2d 1248, 1249 (9th Cir. 1974).

an issue of law for the court.[6]

## I.    FACTS

Defendant James O'Malley is a Fairbanks Police Officer.  Defendant Teague Widmier is an Alaska State Trooper.  Exhibit A, Affidavit of James M. O'Malley, ¶¶ 3, 6.  In January 2001, while they were both assigned to the Alaska State Troopers' statewide drug enforcement unit in Fairbanks, they arrested plaintiff Samuel Carter for a drug-related offense.  Exh. A, ¶ 4.  The arrest occurred in a hotel room after normal check-out time. While standing inside the room, the officers ordered Carter to gather his belongings and leave.  During the process of doing so, Carter opened a night stand drawer, and the officers could see drug paraphernalia.  The officers seized the contraband and arrested Carter.

In the following account of the facts, the indented portions are from the Alaska Court of Appeals' opinion in *Carter v. State*.[7]

### A.    The Investigation

On January 9, 2001, Carter and three other people occupied a room at the Fairbanks Comfort Inn; the other occupants of the room were Pamela Fain, her adult daughter Amy Fain, and Amy's minor child….

Carter was under police surveillance on the morning of January 9th. The police were investigating a report that Carter had threatened Amy Fain with a gun, and they were also aware that Carter had a history of using narcotics.[8]

---

[6]    *Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. 1996).

[7]    *Carter v. State*, 72 P.3d 1256 (Ct. App. Alaska 2003).

[8]    *Id*. at 1257-58.

**B.    The officers obtained the hotel's permission to search Carter's room after he checked out**

Investigator James O'Malley, [] decided to contact the management of the Comfort Inn to seek permission to search Carter's room. O'Malley spoke to the front desk clerk, Judith Tonkovich, asking that he be allowed to search Carter's room after the occupants checked out, but before the housekeeping staff cleaned the room. Tonkovich told O'Malley that he could search the room after the occupants checked out. Tonkovich also informed O'Malley that the established check-out time was one o'clock.[9]

**C.    The officers entered Carter's room lawfully**

O'Malley's conversation with Tonkovich took place around noon. To kill time until Carter and the other occupants checked out, O'Malley ate lunch and then he went to the Comfort Inn to renew his surveillance of the hotel and of Carter's vehicle (which was parked in back of the hotel). O'Malley's purpose was to see who came out of the hotel at check-out time, who drove away in Carter's vehicle, and what they might be carrying.

But at approximately 12:45 p.m., a new development occurred: several Alaska State Troopers arrived to take Amy Fain into custody on a citizen's arrest complaint. O'Malley and his surveillance partner [Widmier] decided to assist the troopers with this arrest.

The troopers and the officers entered the hotel room at about one o'clock. Following a struggle, Amy Fain was arrested and the troopers removed her from the hotel room. But Officer O'Malley and his partner decided not to leave with the troopers; instead, they remained in the hotel room.

**D.    The officers arrested Carter**

Following Amy's arrest, Pamela Fain took Amy's child and left the room. Thus, of the original four occupants, only Carter remained.

---

[9]    *Id*. at 1258.

According to the superior court's later findings of fact, it was now slightly past one o'clock. O'Malley ordered Carter to gather his belongings and leave the room. O'Malley later testified that he believed he had the authority to order Carter to leave because (a) the room was not rented in Carter's name, (b) no one had paid for another night, and (c) it was now past the hotel's check-out time of one o'clock.

While Carter was gathering his belongings, he opened a night stand. Inside the night stand drawer, O'Malley and his partner observed crack pipes and syringes in the night stand. This discovery led to the charge in the present case.[10]

### E.    The superior court found the arrest lawful

Following his indictment, Carter asked the superior court to suppress the evidence against him. He argued that the police had had no right to order him to gather his belongings and leave the room, and thus their observation of the crack pipes and syringes in the night stand drawer was the fruit of a Fourth Amendment violation.

Superior Court Judge Mary E. Greene denied Carter's suppression motion because she concluded that the discovery of the crack pipes and syringes had resulted from a "plain view" observation. . . .

First, Judge Greene found that the police officers lawfully observed this contraband when, after they ordered Carter to leave the room (so that they could begin searching it), Carter opened the night stand drawer. Thus, the contraband was in "plain view". To justify a seizure of evidence under the plain view doctrine, the police must make their observation from a place where they are entitled to be. Judge Greene found that the officers were authorized to remain in Carter's room, and to order Carter to vacate the room, because the management of the hotel had consented to have the officers enter and search the room.

Judge Greene acknowledged that the police "[had] not [been] requested by the Comfort Inn to evict Mr. Carter". But she then

---

[10]    *Id*.

offered an alternative rationale for the seizure of the crack pipes and syringes. She ruled that Carter had no right to occupy the room after one o'clock--*i.e.,* that Carter's expectation of privacy in the room expired at one o'clock--because (1) one o'clock was the Comfort Inn's established check-out time and (2) Carter had done nothing at that point to extend his occupancy of the hotel room (by, for example, informing the hotel management that he intended to stay for another night). She concluded that, because Carter had no expectation of privacy in the room after one o'clock, he could not complain that the officers forced him to gather his belongings and leave the room. [11]

**F.    Carter was convicted**

In September, 2001, a Fairbanks jury found Carter guilty of misconduct involving controlled substances in the fourth degree.  Judge Greene presided.  Officers O'Malley and Widmier testified.  Judith Tonkovich did not testify, thus her testimony discussed below comes from the suppression hearing, a transcript of which is attached as Exhibit B.

**G.    The Alaska Court of Appeals overturned the conviction**

Carter appealed, and the Alaska Court of Appeals overturned his conviction on July 3, 2003.[12]  A copy of that opinion is attached as Exhibit C.

The Alaska Court of Appeals analyzed the matter in terms of Carter's expectation of privacy.  Citing state and federal authority, the court explained that non-renewal of a tenancy does not subject hotel guests to warrantless entries and searches by the

---

[11]      *Id*. at 1258-59.  The suppression hearing took place on March 30, 2001.

[12]      *Carter v. State*, 72 P.3d 1256 (Alaska 2003).

police; rather, depending on the circumstances, non-renewal may subject guests to entries and

searches by hotel management.[13]   The court continued:

> Because Carter retained a reasonable expectation of privacy in the
> room, the police had no authority to remain in Carter's hotel room after
> the arrest of Amy Fain that brought them there, and they had no
> authority to force Carter to gather his belongings and vacate the room.
> This would have been true even if [hotel clerk] Tonkovich had
> purported to authorize the officers' actions. But, as the evidence shows,
> she did not authorize the officers' actions.
>
> . . . .
>
> After the state troopers completed their arrest of Amy Fain, O'Malley
> and his partner remained unlawfully in Carter's hotel room, and they
> unlawfully ordered Carter to gather his possessions and vacate the
> room. Because of the officers' illegal order, Carter was faced with the
> choice of either (1) leaving his possessions behind while the officers
> prepared to unlawfully search his room or, alternatively, (2) gathering
> up his possessions under the scrutiny of the officers--a scrutiny that was
> not legally authorized, since the officers were entitled neither to remain
> in Carter's room nor to order him to leave.
>
> Under these circumstances, Carter did not voluntarily expose his
> possessions to the officers' scrutiny. The officers' observation of the
> crack pipes and syringes was the fruit of their unlawful presence in the

---

[13]      *Carter v. State*, 72 P.2d at 1260.  The court cited the following cases: *United States v. Kitchens,* 114 F.3d 29, 30, 31-32 (4th Cir.1997) (upholding the right of the *manager* to authorize the police to enter a motel room when more than an hour had passed since the established check-out time and the guests had not extended their tenancy); *United States v. Allen,* 106 F.3d 695, 697, 699 (6th Cir.1997) (upholding the right of the *manager* to enter a motel room under similar circumstances); *United States v. Huffhines,* 967 F.2d 314, 316, 318 (9th Cir.1992) (holding that a guest has no reasonable expectation of privacy in their room *against motel management* after the rental period has expired); *United States v. Rahme,* 813 F.2d 31, 33, 35 (2nd Cir.1987) (same); *United States v. Larson,* 760 F.2d 852, 854, 855 (8th Cir.1985) (same); *United States v. Parizo,* 514 F.2d 52, 54 (2nd Cir.1975) (upholding the right of the *manager* to enter a motel room when the defendant rented the room for a single night, paid only for one night, and never informed the management that he wished to stay longer)).

room and their unlawful demand that Carter vacate the room. The superior court should have granted Carter's motion to suppress this evidence and its fruits.[14]

## IV.    ARGUMENT

On the basis of the *Carter* opinion, Carter brought this 42 U.S.C. § 1983 action for money damages for violation of his constitutional rights.  The officers now move for summary judgment on the ground of qualified immunity.  In deciding questions of qualified immunity on a motion for summary judgment, a court must ask (1) whether a federal constitutional right was violated, and (2) whether the right was clearly established.[15]  The first inquiry is addressed below in Part A.  The second inquiry is addressed in Part B.

## A.    THE OFFICERS DID NOT VIOLATE CARTER'S CONSTITUTIONAL RIGHTS

### (1)    The plain view doctrine

Carter claims that his fourth amendment rights were violated.  The Fourth Amendment protects two distinct interests that may be violated by illegal searches or seizures.  As the Supreme Court has explained:

> [T]he first Clause of the Fourth Amendment protects two types of expectations, one involving "searches," the other "seizures." A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.  A "seizure" of property occurs where there is some meaningful interference with an individual's possessory interests in that property.[16]

---

[14]    *Id.* at 1263.

[15]    *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[16]    *Soldal v. Cook County, Illinois,* 506 U.S. 56, 63 (1992) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113 (1984)).

Warrantless searches and seizures are per se unreasonable absent certain restrictive exceptions.[17]  One exception is that evidence may be <u>seized</u> without a warrant when it is within "plain view."[18]  A police officer can lawfully seize property without a warrant under the plain view doctrine if "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," and the incriminating character of the evidence was "immediately apparent."[19]

**(2)     The officers were lawfully in Carter's hotel room when they observed the contraband**

Carter opened the night stand drawer, and the crack pipe and syringes in the drawer were immediately identifiable as drug paraphernalia.  Thus the seizure of the

---

[17]     *See United States v. Place*, 462 U.S. 696, 701 (1983).

[18]     The United States Supreme Court has explained that the plain view doctrine applies to warrantless <u>seizures</u>, not searches:

> The "plain view" doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. <u>If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy</u>. A seizure of the article, however, would obviously invade the owner's possessory interest. If "plain view" justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by <u>seizures</u> rather than by searches.

*Horton v. California*, 496 U.S. 128, 133-34 (1990), (citations and footnotes omitted; emphasis added); *see also United States v. Garcia,* 205 F.3d 1182, 1187 (9th Cir.), *cert. denied,* 531 U.S. 856 (2000).

[19]     *Id.* (citations and internal quotations omitted).

contraband was lawful under the plain view doctrine if O'Malley and Widmier were lawfully in the hotel room when Carter opened the night stand drawer.

O'Malley and Widmier entered Carter's hotel room to assist in the arrest of Amy Fain, and the Alaska Court of Appeals found that their entry into the room was lawful.[20] However, the court found that once the arrest was completed, O'Malley and Widmier "had no authority to remain in the room, and they had no authority to order Carter to gather his belongings and vacate the room."[21] The court reasoned that even though it was after normal check out time, because neither Carter nor the hotel had terminated his tenancy, Carter "retained a reasonable expectation of privacy in the room."[22]

The Alaska court erred. While it is true that tenancy in a hotel room gives rise to a right of privacy under the Fourth Amendment, and it is true that neither Carter nor the hotel had terminated his tenancy,[23] it does not follow that Carter had a "reasonable expectation of privacy" when he opened the night stand drawer. Once police officers lawfully entered the hotel room to arrest Amy Fain, the occupants of the room had no reasonable expectation of privacy in any objects that were in plain view. As the Supreme Court has explained:

---

[20]    72 P.2d at 1263.

[21]    *Id.*

[22]    *Id.* at 1262 (emphasis added).

[23]    As discussed below at p. 19, O'Malley believed that the hotel would not renew the occupants' tenancy for another night, and thus Carter's tenancy expired at check out time.

> The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy.[24]

It follows that while police officers were in his hotel room, Carter only had a reasonable expectation of privacy with respect to objects that were not in plain view.

After the state troopers left with Fain, it was after check out time, and O'Malley told Carter to gather his belongings and vacate the room. Carter could have called the front desk and asked to renew his tenancy for another night, or he could have asked O'Malley and Widmier to wait in the hall while he packed. But he did neither. He began to gather his belongings, and in the course of doing so he opened the night stand drawer, which brought his drug paraphernalia into plain view. And because the illegal nature of the items was immediately apparent, the officers could lawfully seize the contraband and arrest Carter.

The reasoning of the Alaska Court of Appeals is flawed because it requires that Carter's right of privacy in the hotel room was somehow spontaneously renewed when the state troopers left with Amy Fain, even though O'Malley and Widmier were still in the room. O'Malley and Widmier entered the room lawfully, thus Carter had no expectation of privacy until they left the room. If Carter had asked O'Malley and Widmier to leave the room while he packed, and the officers did not have a lawful basis to refuse, that might have been

---

[24]    *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).

sufficient to reestablish Carter's expectation of privacy over the room. But that is not what occurred. It was after normal check out time; and when O'Malley told Carter to vacate the room, Carter acquiesced without objection. As a result, Carter opened the night stand drawer at his peril.[25]

In sum, Carter did not have a "reasonable expectation of privacy in the room" as the Court of Appeals believed; rather, Carter at most had a <u>suspended</u> expectation of privacy which he failed to reestablish before placing the contraband in plain view. Because the officers entered the hotel room lawfully, and were never asked to leave, they did not violate Carter's Fourth Amendment rights.

## B.    THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY

Even if this court were to find that O'Malley and Widmier violated Carter's Fourth Amendment rights, the officers are entitled to summary judgment on the basis of qualified immunity.

### (1)    Qualified Immunity under 42 U.S.C. § 1983

Qualified immunity protects police officers from liability under 42 U.S.C. § 1983 when they have made a reasonable mistake. Qualified immunity is an entitlement not

---

[25]    *Cf. Georgia v. Randolf*, __ U.S. __ , 74 USW 4176 , 2006 WL 707380 (March 22, 2006) (a co-tenant's consent to search cannot override the objection of a present and objecting co-tenant; but a present and non-objecting co-tenant "loses out" on protecting his constitutional rights by virtue of his acquiescence).

to stand trial; it is an immunity from suit rather than a defense on the merits.[26]  The United States Supreme Court has "repeatedly [ ] stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."[27]

The doctrine of qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.[28]  An officer might be mistaken but entitled to qualified immunity for several reasons.  He may be unaware of existing law and how it should be applied.[29]  He may misunderstand facts about the case and assess the legality of his conduct based on that misunderstanding.[30]  Finally, an officer may misunderstand elements of both the facts and the law.[31]  In sum, qualified immunity protects police officers from liability for reasonable mistakes "whether the officer's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."[32]  Qualified immunity has its origin in

---

[26]    *Rudebusch v. Hughes*, 313 F.3d 506, 514 (9th Cir. 2002).

[27]    *Saucier*, 533 U.S. at 201 (quoting *Hunter*, 502 U.S. at 227).

[28]    *Id*.; *Hunter v. Bryant*, 502 U.S. 224, 229 (1991); *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[29]    *Groh v. Ramirez*, 540 U.S. 551, 566 (2004) (Kennedy, J., dissenting).

[30]    *Id.* at 567 (citing *Arizona v. Evans*, 514 U.S. 1 (1995)).

[31]    *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635 (1987)).

[32]    *Id.* (citing *Butz v. Economou*, 438 U.S. 478, 507 (1978)).

the policy concern that few individuals would endure public service if they risked personal liability as a result of their official decisions and actions.[33]

A police officer who has violated a plaintiff's Fourth amendment rights as the result of an error of law is entitled to qualified immunity unless the right was "clearly established."[34]  A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[35]  The right must be established not just as a general proposition, but in a "more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[36]  Whether a right is "clearly established" is determined by federal law, not state law; even if state law has been violated, the issue is whether a warrantless search or arrest is reasonable under the Fourth Amendment to the federal constitution.[37]  Malice is irrelevant to a §1983 claim.[38]

A warrantless search could be unreasonable and therefore unconstitutional under the Fourth Amendment, and yet still be reasonable for purposes of qualified immunity.

---

[33]    *Malley*, 475 U.S. at 339.

[34]    *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[35]    *Id.* at 202.

[36]    *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[37]    *Davis v. Scherer*, 468 U.S. 183, 193-97 (1984).

[38]    *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18, & n.30 (1982).

*Anderson v. Creighton*[39] is the seminal Fourth Amendment /qualified immunity case, and was based on the idea that law enforcement officers might mistakenly but reasonably conclude that a warrantless search was justified by probable cause or exigent circumstances or some other exception; qualified immunity protects the officers who, objectively and reasonably, had such beliefs.[40]

### (2)    O'Malley and Widmier are entitled to qualified immunity because the law was not clearly established and because their mistake was reasonable

#### (a)    The law was not clearly established

The "clearly established" inquiry is not a general one; it must focus on the specific context of the case.[41]  "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[42]

In denying Carter's motion to suppress, Judge Greene found that Carter was not a registered guest and had no right to maintain control of the room, and that the officers had a right to be where they were.  Exh. B, p. 65.  Because the officers had the consent of the Comfort Inn to search the room after the guests were no longer entitled to be there, she found no constitutional violation.  Exh. B, p. 65.  The court of appeals disagreed.  Exh. C.  But

---

[39]    483 U.S. 635 (1987).

[40]    *Id*. at 641.

[41]    *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

[42]    *Id*.

Judge Greene made her considered, and reasonable, decision after a written motion, testimony from witnesses and argument by counsel. The law at the relevant level of particularity could not have been "clearly established" if Judge Greene was in error in her ruling made under these circumstances. If she was wrong, how can the law expect officers on the scene to be correct?

Disagreement between judges has been recognized as one indicia that the law is not "clearly established" for qualified immunity purposes.[43] The court of appeals disagreed with Judge Greene on the constitutionality of the search. And if judges disagree, how appropriate is it to subject police officers on the scene to money damages for being wrong about something that is only resolved after a motion, a hearing with witnesses, oral argument and an appeal?[44]

The disagreement between Judge Greene and the court of appeals indicates that the law was not clearly established at the necessary level of particularity, and thus the officers are entitled to qualified immunity.

---

[43]     *Wilson v. Layne*, 526 U.S. 603, 618 (1999) (discussing a split among circuits over a legal issue, the Court stated: "[I]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.").

[44]     *See Swanson v. Powers*, 93 F.2d 965, 968 (4th Cir. 1991) ("Since qualified immunity is appropriate if reasonable officers could disagree on the relevant issue, it surely must be appropriate when reasonable jurists can do so."); *Lassiter v. Alabama A&M Univ.*, 28 F.3d 1146, 1152 n.8 (11th Cir. 1994) ("[W]e cannot realistically expect that reasonable police officers know more than reasonable judges about the law.") (citation omitted).

    **(b)**    **The officers reasonably believed they had authority to remain in the hotel room**

All the relevant facts did not come out in the trial court. Once O'Malley and Widmier made contact with the uniformed troopers who were present to arrest Amy Fain, and offered to help them, O'Malley made a trip to the Comfort Inn office to let the desk clerk Judy know what was going to happen. Exhibit A, ¶¶ 8, 9. This second contact with Judy was alluded to several times by O'Malley in his testimony at the suppression hearing, but he was never asked specific details about it. Exh. B, pp. 7, 9, 18-20. From talking to Judy and looking at the hotel register, O'Malley found out that the room had been rented by Christine Covington on January 5; that she paid cash; that the rental had been renewed daily, for one day at a time, in cash; and that the occupants were still there and had not yet checked out or renewed. Exh. A, ¶ 8. O'Malley saw a photocopy of Christine Covington's driver's license. Exh. A, ¶ 8. After he told Judy what was going to happen regarding Amy Fain, he asked her "Do you want them to stay or go," or something like that. Exh., A ¶ 12. Judy responded: "We don't want them in there." Exh. A, ¶ 12. O'Malley believed that this conversation gave him authority to remove from the room anyone who wasn't a registered guest and who was still there after one o'clock. Exh. A, ¶ 12. O'Malley did not hear anything about Judy's telephone call to room 231 and her conversation with "Sam," or her conversation with her manager. Exh. A, ¶ 9. Nor did Judy tell him anything about hotel policy for late- or non-renewals. Exh. A, ¶ 9.

    Valid consent is one of the exceptions to the Fourth Amendment's requirement

of a warrant and probable cause to conduct a search.[45]  Because of his conversation with

Judith Tonkovich, the desk clerk, O'Malley believed that he had consent not only to search

room 231 after the one o'clock check-out time, but to require Samuel Carter to leave.  From

his first contact with Judy – over the phone from his office – O'Malley learned that the

occupants of room 231 were still there, that the check-out time was 1:00 p.m., and that he had

permission to search the room after the occupants checked out and before the housekeeping

staff cleaned it up.  Exh. A, ¶ 5.  From his second contact with Judy – in person at the front

office, at a few minutes before 1:00 p.m. – he learned that the occupants were still there, that

they hadn't checked out yet, that they hadn't renewed for another day, that Christine

Covington had been the original renter of the room and that the renewals were one day at a

time and paid in cash.  Exh. A, ¶¶ 8, 9.  After he told Judy about the upcoming arrest of Amy

Fain by the uniformed officers, he asked her "Do you want them to stay or go," or something

like that.  Exh. A, ¶ 9.  Her response was "We don't want them in there."  Exh. A, ¶ 9.  From

this, O'Malley believed that Judy was giving him, and the other officers, authority to remove

from the room anyone left there after one o'clock who was not a registered guest.  Exh. A, ¶

12.  Even a registered hotel guest has no reasonable expectation of privacy in a room after the

rental period has expired.[46]  This proposition was cited in *Carter* as meaning that the guest

---

[45]      *United States v. Huffhines*, 967 F.2d 314, 318 (9th Cir. 1992) (citing
*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

[46]      *Huffhines*, 967 F.2d at 318.

has no expectation of privacy as against <u>hotel management</u>.[47]  But hotel management can give valid consent to police to search a room, especially where the guests have not renewed and it is beyond check-out time.[48]  Here, not only did O'Malley have the consent of management through Judy to search the room after check-out time, but also consent, implicitly, to remove any non-registered guests from the room after 1:00 p.m. because there had been no renewal by then.  Carter was not the registered guest and hadn't renewed. Because O'Malley had what appeared to be management's consent, <u>if</u> he violated Carter's constitutional rights by telling him to gather his belongings and leave, O'Malley made a reasonable mistake.  Such a reasonable mistake is within the ambit of qualified immunity.

## V.   CONCLUSION

The court should grant summary judgment to officers O'Malley and Widmier on Carter's § 1983 claim because 1) there was no constitutional violation and 2) if there was a constitutional violation, the officers are entitled to qualified immunity.  Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.[49]  Judge Greene – who saw the witnesses and heard the testimony – found that the search was not pretextual and that the discovery of the drug paraphernalia was inadvertent.  Exh. B, p. 64. She also found the officers were in a place they had a right to be, in the presence of an

---

[47]     *Carter*, 72 P.3d at 1260 & n.11.

[48]     *Huffhines*, 967 F.3d at 318 (valid consent to police search given by manager where rent expired at noon and guest had failed to renew by then).

[49]     *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

occupant – Carter – who had no right to be there.  Exh. B, pp. 64-65.  O'Malley reasonably

believed that he had the consent of the hotel to tell Carter to leave.  Carter did not object.  On

these facts, O'Malley and Widmier were not plainly incompetent, nor did they knowingly

violate the law.  Accordingly, they are entitled to qualified immunity

DATED this 13th day of April, 2006 at Anchorage, Alaska.

DAVID W. MÁRQUEZ
ATTORNEY GENERAL

By:    s/ Venable Vermont, Jr.
        Assistant Attorney General
        Office of the Attorney General
        1031 W. 4th Ave., Ste. 200
        Anchorage, AK 99501
        Phone: (907) 269-5190
        Fax:    (907) 258-0760
        Venable_Vermont@law.state.ak.us
        TWC_ECF@law.state.ak.us
        Alaska Bar No. 8306067

This is to certify that on this date, a copy of the
foregoing motion for summary judgment/exhibits
is being mailed to:

Samuel Kevin Carter
c/o CCA-FCC
P.O. Box 6200
Florence, AZ  85232

s/ Venable Vermont, Jr. 4/13/06