# LIST OF EXHIBITS

1.   Exhibit A – Affidavit of James M. O'Malley, April 12, 2006

2.   Exhibit B – Excerpt of Transcript of Suppression Hearing
         Before Judge Greene, March 30, 2001

3.   Exhibit C – *Carter v. State*, 72 P.3d 1256 (Alaska 2003)

# EXHIBIT A

DAVID W. MÁRQUEZ
ATTORNEY GENERAL

Venable Vermont, Jr.
Assistant Attorney General
Office of the Attorney General
1031 W. 4th Ave., Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5190
Fax: (907) 258-0760
Email: TWC_EFC@law.state.ak.us

Attorney for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF FAIRBANKS

SAMUEL KEVIN CARTER,                )
                                    )
            Plaintiff,              )    Case No. 4:05-cv-00016-RRB
                                    )
      vs.                           )
                                    )
OFFICER JAMES O'MALLEY, and         )
OFFICER TEAGUE WIDMIER,             )
                                    )    **AFFIDAVIT OF JAMES M. O'MALLEY**
            Defendants.             )
_____)

STATE OF ALASKA        )
                       ) ss
FOURTH JUDICIAL DISTRICT )

     1.    My name is James M. O'Malley. I make this affidavit based upon my personal knowledge of the matters related below.

     2.    I am a defendant in this lawsuit. I currently reside in Fairbanks, Alaska, and work as a patrol officer for the City of Fairbanks Police Department.

     3.    In January 2001, I was working as a police officer for the City of

Exhibit ___A___
Page ___1___ of ___6___

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

Fairbanks. I was assigned to work with the Statewide Drug Enforcement Unit (SDEU), which is a cooperative venture between the Alaska State Troopers and local law enforcement agencies. In January 2001 I had been doing this for well over two years.

4.    On January 9, 2001, based on information from another officer who had performed a welfare check on Amy Fain, I knew that Samuel Carter was in room 231 of the Comfort Inn in Fairbanks. Carter had a history of involvement in drug use, and was know to those of us in the SDEU.

5.    Sometime before noon, from my office, I called the Comfort Inn and talked with "Judy," the desk clerk. After I identified myself, I asked if the people in room 231 were still there and she said "yes." I then asked if, when they checked out, I could go in the room and look around before the housekeeping staff cleaned it up. She said "yes." I asked what time check-out was and she told me "1:00 p.m."

6.    About 12:30 p.m., I went to the Comfort Inn with Investigator Teague Widmier, an Alaska State Trooper who was working with me in the SDEU. We were in plain clothes, in an unmarked car. We set up surveillance where we could see the vehicle that we knew belonged to Samuel Carter. We wanted to see if he came out at check-out time, who might be with him, what they were carrying, and who drove away with him.

7.    Within 10 or 15 minutes, a marked Alaska State Trooper patrol car pulled in near the front of the hotel. From dispatch, over the radio, I learned that the officer, Trooper Olson, was there to take Amy Fain into custody on a citizen's complaint. I

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

Exhibit _____A_____

Page ___2___ of __6__

contacted Trooper Olson and told him we – Trooper Widmier and I – would assist with the arrest. He already had another patrol unit, with two officers, coming to assist. We waited just a minute or two for them to arrive, then I went into the front office and talked again, this time in person, with Judy, the desk clerk.

8.    This second contact with Judy lasted only several minutes. I told her about the uniformed officers and what they were here to do. She told me that the people were still in the room – or at least that they hadn't checked out yet – and then showed me the hotel register. I saw that the room was rented to Christine Covington on January 5, and that she paid cash. The rental had been renewed each day, for one day at a time, each time paying in cash. Judy showed me a photocopy of Christine Covington's driver's license, which the hotel required because of the cash rental. I did not see anything on the register that referred to Samuel Carter or Amy Fain.

9.    During this brief second contact, Judy did not tell me anything about hotel policy for late renewals. She did tell me they (the occupants of room 231) had not renewed for another day and that check-out time was 1:00 p.m. It was just a few minutes before 1:00 when I was speaking to her. Judy did not tell me anything about talking to the occupants, or to "Sam," after my earlier telephone conversation with her, or about any conversations with her supervisor. After I explained about the upcoming arrest of Amy Fain, I asked her "Do you want them to stay or go," or words to that effect, referring to any remaining occupants. She told me "We don't want them in there."

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

Affidavit Of James M. O'Malley
*Carter v. O'Malley et al.*
4:05-cv-0016-RRB
Page 3 of 6

Exhibit _A_
Page _3_ of _6_

10.    Once I left the office, I rejoined the other officers. On the way up to room 231, we ran into Pamela Fain, Amy's mother, whom I knew from an earlier contact. She agreed to go back up to the room and assist us in getting in. When she used her room key, the door wouldn't open. It was bolted from inside. She began knocking on the door and calling out "Amy, it's Pam. Open the door. It's mom," and similar things. When there was no immediate response, I went back down to the office, where I had a third contact with Judy to see if there was another way to get into the room. There wasn't, but when I got back to room 231, the door was open and the officers were already in the room.

11.    In addition to the uniformed officers and Trooper Widmier, others in the room were Amy and Pam Fain, a small child, and Samuel Carter, who was lying on the bed. The officers explained to Amy that they were there to arrest her; she fought with them briefly, but was subdued fairly quickly. Once she was removed by the uniformed officers, the child was turned over to Pam Fain, who was the child's grandmother. They left too, and then only myself and Widmier and Carter were in the room.

12.    Once everyone else was gone, I then explained to Carter why Amy had been arrested; he may have been asleep earlier. I then told Carter that he needed to gather up his things and vacate the room. I did this because it was now past the 1:00 check-out time; the room rental had not been renewed, according to Judy; the registered occupant – Christine Covington – was not in the room; and Judy had told me "we want them out of there." Based on these facts, I believed that Judy was giving me authority to remove from

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

Affidavit Of James M. O'Malley
*Carter v. O'Malley et al.*
4:05-cv-0016-RRB
Page 4 of 6

Exhibit ___A___
Page ___4___ of ___6___

the room anyone who was not a registered guest, even though she did not expressly state that.

13.     As Carter was gathering his belongings, Trooper Widmier was able to see into a drawer in the nightstand where Carter was removing some items. Widmier said "There is crack pipes and syringes in there." I then looked around Carter, whose body had been blocking my view, and saw them as well. I told Carter to drop whatever he had in his hands. At first he refused, but ultimately did so when Widmier and I each grabbed one of his hands. He dropped several rings as well as a plastic vial that appeared to have white residue in it.

14.     Once I saw the vial, which appeared to be a drug container, as well as the syringes and crack pipe, I told Carter the room was being secured while we applied for a search warrant. I told him to leave everything in the room. He left with only the clothes he had on and a baseball cap and jacket.

15.     Based on a telephone call from my supervisor, Carter was arrested outside on the hotel grounds a few minutes later, after he had gone away and then come back. While Widmier secured the room, I went to court and got a search warrant that allowed us to seize the drug paraphernalia that we had seen, as well as other items that were ultimately found in the drawer. Some of the drug paraphernalia had white residue on them that was tested at the Department of Public Safety crime lab; the white residue was positive for cocaine. Those findings were used to prosecute Carter for misconduct involving a

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

Affidavit Of James M. O'Malley
*Carter v. O'Malley et al.*
4:05-cv-0016-RRB
Page 5 of 6

Exhibit    A
Page    5    of    6

controlled substance.

Dated this _12th_ day of _April_____, 2006 at Fairbanks, Alaska.

_____
James M. O'Malley

SUBSCRIBED AND SWORN to before me this _12th_ day of _April_____, 2006.

_____
Notary Public in and for Alaska
My commission expires: _4/21/09_

Affidavit Of James M. O'Malley
_Carter v. O'Malley et al._,
4:05-cv-0016-RRB
Page 6 of 6

Exhibit ___A___
Page ___6___ of ___6___