**EXHIBIT C**

Westlaw.

72 P.3d 1256                                                                                                 Page 1

72 P.3d 1256
(Cite as: 72 P.3d 1256)

▷

Court of Appeals of Alaska.
Samuel K. CARTER, Appellant,
v.
STATE of Alaska, Appellee.
No. A-8217.

July 3, 2003.

Defendant was convicted in the Superior Court, Fourth Judicial District, Fairbanks, Mary E. Greene, J., of fourth-degree controlled substance misconduct. The Court of Appeals, Mannheimer, J., held that: (1) defendant did not lose all expectation of privacy in hotel room; (2) hotel management did not authorize police to evict defendant; and (3) defendant did not voluntarily expose his possessions to police officer's scrutiny.

Reversed.

West Headnotes

**[1] Searches and Seizures** 26
349k26 Most Cited Cases

**[1] Searches and Seizures** 176
349k176 Most Cited Cases
Defendant did not lose all expectation of privacy in hotel room by remaining in room after check-out time passed, and thus police officers had no authority to remain in hotel room after arrest of one of occupants and to order defendant to gather his belongings and vacate room, where it was not customary practice of hotel to immediately assert its right of possession against guests who missed one o'clock checkout time, and desk clerk did not object after she contacted defendant after checkout time to determine whether he would be checking out and defendant stated that he would let hotel management know.

**[2] Criminal Law** 394.6(4)

110k394.6(4) Most Cited Cases
Trial court's finding, on motion to suppress evidence seized in search of hotel room, that hotel management authorized police to evict defendant from hotel room after checkout time had passed was clearly erroneous, where desk clerk testified that she gave permission to search hotel room after guests had checked out, but before cleaning staff went to work on room, and desk clerk did not authorize police to search room at checkout time, even if occupants of room failed to expressly arrange for extension of their tenancy.

**[3] Controlled Substances** 135
96Hk135 Most Cited Cases
Defendant, who was ordered by police to leave hotel room after checkout time had passed, did not voluntarily expose his possessions to police officer's scrutiny, and thus crack pipe in nightstand drawer was not in plain view, where officer's demand that defendant gather belongings and leave room was unlawful. U.S.C.A. Const.Amend. 4.
*1257 Michael A. Stepovich, Fairbanks, for Appellant.

Kenneth J. Diemer, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before:   COATS,   Chief   Judge,   and MANNHEIMER and STEWART, Judges.

OPINION

MANNHEIMER, Judge.

Samuel K. Carter was one of four occupants of a hotel room in Fairbanks. The police were interested in investigating the room because they suspected that drug activity was occurring there. The police obtained the hotel management's permission to search the room after Carter and the other occupants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 1 of 8

72 P.3d 1256                                                                                                    Page 2

72 P.3d 1256

(Cite as: 72 P.3d 1256)

checked out (*i.e.*, after they vacated the room, and before the hotel's cleaning staff began to work on the room).

However, the police decided to speed up this process. The police knew that the hotel's check-out time was one o'clock p.m., so at one o'clock they ordered Carter to gather his belongings and leave the room. In the process of gathering his belongings, Carter opened a night stand drawer. When he did so, the police observed crack pipes and syringes in the drawer. Based on this discovery (and other evidence obtained in the ensuing investigation), Carter was convicted of fourth-degree controlled substance misconduct. [FN1]

    FN1. AS 11.71.040(a).

We conclude that the police did not have the authority to remain in Carter's hotel room, nor did they have the authority to order Carter to gather his belongings and leave the hotel room. We therefore conclude that the evidence against Carter should have been suppressed, and that his conviction must be reversed.

*The evidence relating to Carter's tenancy in the hotel room and the authority granted to the police by the hotel management*

On January 9, 2001, Carter and three other people occupied a room at the Fairbanks Comfort Inn; the other occupants of the room were Pamela Fain, her adult daughter Amy Fain, and Amy's minor child.

The hotel room had initially been rented on January 5th for one night. However, the rental had been extended on a day-to-day basis, up to and including the night of January 8th. The established check-out time at the Comfort Inn was one o'clock in the afternoon. *1258 Thus, the check-out time for Carter and the other occupants of the room was one o'clock on the afternoon of January 9th.

Carter was under police surveillance on the morning of January 9th. The police were investigating a report that Carter had threatened Amy Fain with a gun, and they were also aware that Carter had a history of using narcotics.

Investigator James O'Malley, a Fairbanks police officer assigned to the Statewide Drug Enforcement Unit, decided to contact the management of the Comfort Inn to seek permission to search Carter's room. O'Malley spoke to the front desk clerk, Judith Tonkovich, asking that he be allowed to search Carter's room after the occupants checked out, but before the housekeeping staff cleaned the room. Tonkovich told O'Malley that he could search the room after the occupants checked out. Tonkovich also informed O'Malley that the established check-out time was one o'clock.

O'Malley's conversation with Tonkovich took place around noon. To kill time until Carter and the other occupants checked out, O'Malley ate lunch and then he went to the Comfort Inn to renew his surveillance of the hotel and of Carter's vehicle (which was parked in back of the hotel). O'Malley's purpose was to see who came out of the hotel at check-out time, who drove away in Carter's vehicle, and what they might be carrying.

But at approximately 12:45 p.m., a new development occurred: several Alaska State Troopers arrived to take Amy Fain into custody on a citizen's arrest complaint. O'Malley and his surveillance partner decided to assist the troopers with this arrest.

The troopers and the officers entered the hotel room at about one o'clock. Following a struggle, Amy Fain was arrested and the troopers removed her from the hotel room. But Officer O'Malley and his partner decided not to leave with the troopers; instead, they remained in the hotel room.

Following Amy's arrest, Pamela Fain took Amy's child and left the room. Thus, of the original four occupants, only Carter remained.

According to the superior court's later findings of fact, it was now slightly past one o'clock. O'Malley ordered Carter to gather his belongings and leave the room. O'Malley later testified that he believed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C

Page 3 of 8

72 P.3d 1256                                                                                     Page 3
72 P.3d 1256
(Cite as: 72 P.3d 1256)

he had the authority to order Carter to leave because (a) the room was not rented in Carter's name, (b) no one had paid for another night, and (c) it was now past the hotel's check-out time of one o'clock.

While Carter was gathering his belongings, he opened a night stand. Inside the night stand drawer, O'Malley and his partner observed crack pipes and syringes in the night stand. This discovery led to the charge in the present case.

*The superior court's ruling that the police lawfully discovered this evidence under the "plain view" doctrine, and (alternatively) because Carter had no expectation of privacy in the room after one o'clock*

Following his indictment, Carter asked the superior court to suppress the evidence against him. He argued that the police had had no right to order him to gather his belongings and leave the room, and thus their observation of the crack pipes and syringes in the night stand drawer was the fruit of a Fourth Amendment violation.

Superior Court Judge Mary E. Greene denied Carter's suppression motion because she concluded that the discovery of the crack pipes and syringes had resulted from a "plain view" observation. But the judge's decision actually contains two alternative rationales for the seizure of the crack pipes and syringes.

First, Judge Greene found that the police officers lawfully observed this contraband when, after they ordered Carter to leave the room (so that they could begin searching it), Carter opened the night stand drawer. Thus, the contraband was in "plain view". To justify a seizure of evidence under the plain view doctrine, the police must make their observation from a place where they are entitled to be. Judge Greene found that the officers were authorized to remain in Carter's room, and to order Carter to vacate the room, because the management of the *1259 hotel had consented to have the officers enter and search the room.

Judge Greene acknowledged that the police "[had] not [been] requested by the Comfort Inn to evict Mr. Carter". But she then offered an alternative rationale for the seizure of the crack pipes and syringes. She ruled that Carter had no right to occupy the room after one o'clock--*i.e.*, that Carter's expectation of privacy in the room expired at one o'clock--because (1) one o'clock was the Comfort Inn's established check-out time and (2) Carter had done nothing at that point to extend his occupancy of the hotel room (by, for example, informing the hotel management that he intended to stay for another night). She concluded that, because Carter had no expectation of privacy in the room after one o'clock, he could not complain that the officers forced him to gather his belongings and leave the room.

*A hotel guest's expectation of privacy in a hotel room*

[1] The superior court's decision rests on two foundations, one factual and the other legal. The legal foundation of the superior court's decision is the court's ruling that, if check-out time passes without action on the part of a hotel guest to renew their tenancy, the hotel guest loses all expectation of privacy in their hotel room. This is not correct. The correct rule, as explained by our supreme court in *Sumdum v. State*, 612 P.2d 1018 (Alaska 1980), is that, depending on the factual circumstances and the hotel's own policies, the guest may suffer a diminution of their expectation of privacy in the room *as against the hotel management.*

In *Sumdum*, the defendant was staying in a hotel room that was registered in someone else's name. The police were interested in Sumdum because he had been identified as the suspect in a theft. The police contacted the hotel management at twelve-thirty in the afternoon. The hotel's check-out time was eleven in the morning, and the desk clerk confirmed that neither the registered guest nor anyone else had paid for another night's lodging or had otherwise indicated an intent to extend their stay. [FN2]

   FN2. *Sumdum*, 612 P.2d at 1020.

The desk clerk later testified that whenever hotel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit __C__
Page __3__ of __8__

72 P.3d 1256 Page 4

72 P.3d 1256

(Cite as: 72 P.3d 1256)

guests failed to contact the management within an hour or so after the eleven o'clock check-out time, it was the clerk's responsibility to ascertain (1) whether the guests had absconded without paying for the room or, if not, (2) whether the guests intended to extend their stay or (instead) vacate the room. [FN3] To conduct this inquiry, the clerk would first telephone the room. If the guests did not answer the phone, the clerk would go to the room and attempt to make contact by knocking on the door. If the clerk was still unsuccessful in making contact with the guests, the clerk would then enter the room to investigate the situation. [FN4]

   FN3. *Id.* at 1021, 1022 n. 6.

   FN4. *Id.* at 1020.

In Sumdum's case, the desk clerk followed the hotel's standard procedure. Because it was twelve-thirty (*i.e.,* an hour and a half after the normal check-out time), she telephoned the room. After receiving no answer, she walked to the room and knocked on the door. [FN5] Still receiving no response, the desk clerk went back to her office, retrieved the hotel management's key to the room, and then opened the room. The police were at her side in the corridor. When the desk clerk opened the door, the police saw incriminating evidence (fruits of the theft) in plain view. [FN6]

   FN5. *Id.*

   FN6. *Id.*

The supreme court recognized that the legality of the officers' discovery of this incriminating evidence turned on whether the officers validly obtained their view of the interior of the room. [FN7] The court acknowledged that "[a] guest in a motel has a constitutionally protected right [of] privacy in [their] room"; thus, in normal circumstances, "motel personnel cannot consent to a search of the guest's room". [FN8] However, the guest's *1260 expectation of privacy changes when the rental period has ended. The court explained that

   FN7. *Id.* at 1021.

   FN8. *Id.*

   after the rental period has terminated, a guest's reasonable expectations of privacy are greatly diminished *with respect to the right of [the] motel management to enter [the room].*
*Sumdum,* 612 P.2d at 1021 (emphasis added).

The supreme court concluded that, because the desk clerk entered Sumdum's room under circumstances when she normally would have done so, and in accordance with the motel's customary procedures, her entry was lawful. The supreme court further concluded that the lawfulness of the desk clerk's entry into the room "was not altered by the presence of the police". [FN9]

   FN9. *Id.*

However, in an accompanying footnote, the supreme court clarified that the right to enter the room upon the termination of the guest's tenancy belongs to the hotel management, not the police, and that any such entry must normally conform to the practices of the hotel management. The court cautioned that, in future cases, "[i]f the police presence results in actions *that would not normally have occurred within the time frame in question,* [we] will look carefully at the circumstances to determine whether [the alleged] independent private purposes [for the entry] are merely a sham for warrantless police searches". [FN10]

   FN10. *Id.* at 1022 n. 7 (emphasis added).

This insistence on honoring the standard practices of the hotel is simply another facet of the rule that the supreme court stated earlier in its opinion: a guest who fails to meet the check-out deadline set by the hotel does not lose all expectation of privacy in the room; rather, the guest suffers a diminution of their expectation of privacy with respect to the right of the *hotel management* to enter the room.

This same rule is consistently followed by the federal courts that have addressed this issue.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 4 of 8