72 P.3d 1256                                                                                                           Page 5

72 P.3d 1256

(Cite as: 72 P.3d 1256)

Although these courts sometimes phrase the rule in terms of the guest losing all expectation of privacy after check-out time expires without renewal of the tenancy, these federal cases uniformly involve entries by hotel management or entries by police officers at the express authorization of hotel management. That is, non-renewal of the tenancy does not subject hotel guests to warrantless entries and searches by the police; rather, depending on the circumstances, non-renewal may subject guests to entries and searches by hotel management. [FN11]

> FN11. See *United States v. Kitchens*, 114 F.3d 29, 30, 31-32 (4th Cir.1997) (upholding the right of the *manager* to authorize the police to enter a motel room when more than an hour had passed since the established check-out time and the guests had not extended their tenancy); *United States v. Allen*, 106 F.3d 695, 697, 699 (6th Cir.1997) (upholding the right of the *manager* to enter a motel room under similar circumstances); *United States v. Huffhines*, 967 F.2d 314, 316, 318 (9th Cir.1992) (holding that a guest has no reasonable expectation of privacy in their room *against motel management* after the rental period has expired); *United States v. Rahme*, 813 F.2d 31, 33, 35 (2nd Cir.1987) (same); *United States v. Larson*, 760 F.2d 852, 854, 855 (8th Cir.1985) (same); *United States v. Parizo*, 514 F.2d 52, 54 (2nd Cir.1975) (upholding the right of the *manager* to enter a motel room when the defendant rented the room for a single night, paid only for one night, and never informed the management that he wished to stay longer).

As the *Sumdum* decision suggests, the extent to which a hotel guest's expectation of privacy is diminished will vary according to the particular circumstances of the case and the customary practices of the hotel. The Fourth Circuit expressly acknowledged this same rule in *United States v. Kitchens*, 114 F.3d 29, 32 (4th Cir.1997): "[a motel] guest may still have a legitimate expectation of privacy even after his rental period has terminated, if there is a pattern or practice which would make that expectation reasonable".

Professor Wayne R. LaFave discusses this feature of Fourth Amendment law in his treatise on the law of search and seizure. Professor LaFave agrees that when a guest misses the hotel's check-out deadline, the guest's rights--*i.e.*, the extent of the guest's continued expectation of privacy in the room--will depend, in large measure, on the hotel management's customary practices and the circumstances of the tenant's relationship *1261 with the hotel management. Thus, "no abandonment [of the premises] will be deemed to have occurred[,] even after the initially indicated term of [occupancy has expired, if, for example,] the tenant had arranged for credit card payment of all charges and both the motel [management] and the tenant treated the tenant's non-departure as extending the term [of occupancy]." Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (3rd ed.1996), § 2.3(a), Vol. 1, p. 471.

Professor LaFave's statement of the law is borne out by the cases. For example, in *United States v. Owens*, 782 F.2d 146, 150 (10th Cir.1986), and in *United States v. Watson*, 783 F.Supp. 258, 263 (E.D.Va.1992), the courts held that hotel guests retained a legitimate expectation of privacy in their rooms even though the established check-out time had elapsed because the hotel management had acquiesced in the guests' pattern of paying their bills after the check-out time.

Thus, under our supreme court's decision in *Sumdum* and the corroborating authorities discussed above, Carter's expectation of privacy in the hotel room did not come to an abrupt end at one o'clock in the afternoon. In particular, Carter continued to have a right of privacy *vis-a-vis* the police. If the police had any authority to remain in Carter's room and order him to vacate the room, that authority had to be derived from the express consent of the hotel management.

Because the one o'clock check-out time had passed, Carter's expectation of privacy *vis-a-vis* the hotel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit _C_
Page _5_ of _8_

72 P.3d 1256 Page 6
72 P.3d 1256
(Cite as: 72 P.3d 1256)

management was conceivably diminished. But, as the supreme court held in *Sumdum,* the extent of that diminution hinged on the customary practices of the Comfort Inn and Carter's interaction with the hotel management.

We now examine the evidence on these issues.

*Carter's expectation of privacy as against the management of the Comfort Inn, and the scope of the permission given to the police by the management of the Comfort Inn*

At the suppression hearing, Comfort Inn desk clerk Judith Tonkovich described the Comfort Inn's customary practices regarding its one o'clock check-out time, and she also testified to her conversations with Carter about his continued tenancy as a hotel guest.

Tonkovich told the superior court that, even though the Comfort Inn's established check-out time is one o'clock, the hotel's guests often remain away from their rooms past that time, not realizing that the scheduled check-out is one o'clock. For this reason, especially if the hotel is scheduled to be full that night, the hotel management will call guests to remind them of the check-out time, and to ask if they intend to check out on time or if they are planning to extend their stay.

Tonkovich also told the superior court that it was not uncommon for hotel guests to contact the desk clerk after one o'clock and indicate that they wished to stay at the hotel for another night. The hotel apparently acquiesced in this practice. In particular, Tonkovich expressly declared that she had not authorized Officer O'Malley and his partner to force Carter to vacate the room at one o'clock.

Tonkovich conceded that O'Malley contacted her and asked her when the occupants of Carter's room were due to leave. In answer to O'Malley's question, Tonkovich told him that the occupants of the room were *due* out at one o'clock-but she also told him that she did not know their plans. Tonkovich told O'Malley that she "[would] call and see if they [were] staying over, or whatever".

Tonkovich did in fact call the room. She spoke to a man who identified himself as "Sam"--*i.e.,* apparently Carter. When Tonkovich asked "Sam" whether the occupants of the room would be checking out that day, he told her that "they would let [her] know". Tonkovich relayed this information to her supervisor, the hotel manager. She told the manager that she had not heard a definite answer from the occupants of the room, and that "they might be staying over".

Based on this testimony (which was undisputed), it was not the Comfort Inn's customary practice to immediately assert its right of possession against guests who missed the one o'clock check-out time. To the contrary: Tonkovich's testimony suggests that the *1262 Comfort Inn routinely granted guests a certain amount of leeway when the check-out time was missed.

Moreover, leaving aside the Comfort Inn's general approach to the one o'clock check-out time, Tonkovich's conversation with Carter showed that she specifically granted leeway to the occupants of Carter's room. When Carter told Tonkovich that he and his friends would let her know later whether they intended to extend their stay at the hotel, Tonkovich did not object to his answer, nor did she set a deadline for Carter's decision.

In sum, based both on the customary practices of the Comfort Inn and on Carter's own conversation with Tonkovich (a representative of the hotel management), Carter continued to have a reasonable expectation of privacy in the hotel room after one o'clock.

Because Carter retained a reasonable expectation of privacy in the room, the police had no authority to remain in Carter's hotel room after the arrest of Amy Fain that brought them there, and they had no authority to force Carter to gather his belongings and vacate the room. This would have been true even if Tonkovich had purported to authorize the officers' actions. But, as the evidence shows, she did not authorize the officers' actions.

[2] As already noted, Tonkovich expressly testified

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 6 of 8

72 P.3d 1256                                                                                                    Page 7

72 P.3d 1256

(Cite as: 72 P.3d 1256)

that she did *not* authorize the officers to evict Carter from the hotel room at one o'clock. And Tonkovich's testimony on this point is consistent with Officer O'Malley's testimony. O'Malley did not assert that Tonkovich authorized him to force Carter from the room at one o'clock. Rather, O'Malley testified that when he contacted Tonkovich, he asked her for permission to search Carter's hotel room after the occupants *checked out* --that is, after the hotel management had regained its right of possession, and before the cleaning staff went to work on the room.

When Judge Greene denied Carter's suppression motion, she found that the management of the Comfort Inn consented to have the police officers "search [Carter's room] after the guests were no longer entitled to be there"--by which the judge meant that the hotel management authorized the police to search the room at one o'clock if no one had explicitly arranged for another day's tenancy. This finding is clearly erroneous. [FN12]

> FN12. A finding is "clearly erroneous" if it "leaves the [reviewing court] with a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding". *Geczy v. LaChappelle*, 636 P.2d 604, 606 n. 6 (Alaska 1981).

The evidence shows that Tonkovich authorized the police to search the hotel room after Carter and the other guests *checked out--i.e.*, after they voluntarily vacated the room. Tonkovich did not authorize the police to evict Carter from the room at one o'clock, nor did she authorize the police to search the room at the stroke of one if the occupants of the room failed to expressly arrange for an extension of their tenancy.

Judge Greene further found that Carter "did not have to open anything; he did not have to pack up anything"--apparently suggesting that when the police officers saw the crack pipes and the syringes in the night stand drawer, this was because Carter voluntarily displayed or gathered up these items in a manner that allowed them to be seen by the officers.

Again, this finding is clearly erroneous.

[3] After the state troopers completed their arrest of Amy Fain, O'Malley and his partner remained unlawfully in Carter's hotel room, and they unlawfully ordered Carter to gather his possessions and vacate the room. Because of the officers' illegal order, Carter was faced with the choice of either (1) leaving his possessions behind while the officers prepared to unlawfully search his room or, alternatively, (2) gathering up his possessions under the scrutiny of the officers--a scrutiny that was not legally authorized, since the officers were entitled neither to remain in Carter's room nor to order him to leave.

Under these circumstances, Carter did not voluntarily expose his possessions to the officers' scrutiny. The officers' observation of the crack pipes and syringes was the fruit of their unlawful presence in the room and their unlawful demand that Carter vacate the room. The superior court should have granted *1263 Carter's motion to suppress this evidence and its fruits.

*Conclusion*

To sum up: As a factual matter, the hotel management did not give the police the authority to enter Carter's room and remove him from the premises at one o'clock. Moreover, even if the hotel management had purported to consent to these police actions, the hotel management would have exceeded its own authority--because, based on the hotel's customary practices regarding check-out, and based on Carter's earlier conversation with the desk clerk, Carter retained a reasonable expectation of privacy in the room even after one o'clock.

It is true that the officers had independent authority to enter the room to assist the state troopers in arresting Amy Fain. But once this task was completed, the police had no authority to remain in the room, and they had no authority to order Carter to gather his belongings and vacate the room.

Thus, the police officers' observation of the crack pipes and syringes can not be justified under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit ___C___

Page __7__ of _8_

72 P.3d 1256 Page 8
72 P.3d 1256
**(Cite as: 72 P.3d 1256)**

doctrine of plain view. Rather, the officers' observation of this contraband was the fruit of their illegal actions.

The judgement of the superior court is REVERSED.

72 P.3d 1256

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 8 of 8