**ISSUES FOR REVIEW:**

I.   *The court erred in denying Appellant's motion to suppress evidence seized as a result of a warrantless search of a hotel room occupied by Samuel K. Carter, and otherwise erred in concluding that valid consent had been given to search the room..*

II.  *The court erred in not excusing a juror, when an alternate was readily available, who expressed, knowledge, compassion and friendship with a critical witness in the case*

III. *The court erred in not directing the disclosure of juror information in the possession or control of the District Attorney pursuant to* <u>Tagala v. State</u>*, 812 P.2d 604 (Alaska App. 1991).*

**STATEMENT OF THE CASE:**

Samuel K. Carter was charged with a violation of A.S. 11.71.040(a), a single count alleging that on or about January 9, 2001 at or near Fairbanks, Alaska he knowingly and unlawfully possessed cocaine.  (Tr. 3:1-65:14)

Carter was convicted of this count after a jury trial.  (Tr. 425:9 *et seq.*)  This was the second trial of this matter the first having resulted in a court ordered mistrial.  (Tr. 70:6-10 in part)

**ARGUMENT:**

I.  ***The court erred in denying Appellant's motion to
    suppress evidence seized as a result of a warrantless
    search of a hotel room occupied by Samuel K. Carter,
    and otherwise erred in concluding that valid consent
    had been given to search the room.***

STANDARD OF REVIEW:

To the extent these arguments assert matters of
constitutional defect; the standard of review is harmless error
beyond a reasonable doubt.

> This court restated the Chapman standard for certain
> federal constitutional errors in Love v. State, 457
> P.2d 622 (Alaska 1969).  We hold today that this
> standard of "harmless error beyond a reasonable doubt"
> applies to LaVigne's claim of constitutional error.
> LaVigne v. State, 812 P.2d 217 (Alaska 1991)

STATEMENT OF FACTS:

In response to a motion to suppress evidence (Exc. 7) which
was opposed by the State (Exc. 12) an evidentiary hearing was
conducted on March 30, 2001. (Tr. 3:6 *et seq.*)

Fairbanks Police officer James O'Malley, assigned to the
Statewide Drug Enforcement Unit, testified that on January 9,
2001 he received information that Sam Carter and Amy Fain were
occupying a room at the Comfort Inn in Fairbanks.  (Tr. 5:5 *et
seq.*)  Speculating that drug activity may be taking place
O'Malley contacted the Comfort Inn and spoke to a person named

-3-

Judy who confirmed that Carter and Amy Fain still occupied the room. (Tr. 5:12-22) He secured an agreement that when they had checked out, the room would remain untouched in order for police to conduct a search. He was advised that checkout time was 1:00 PM. (Tr. 5:12-22)

O'Malley contacted Investigator Widmier and decided to conduct surveillance of the hotel, arriving at approximately 12:30 AM. (Tr. 5:23-6:3). While there, an Alaska State Trooper vehicle with uniformed officers arrived to arrest Amy Fain on a criminal complaint. (Tr. 6:15-24) O'Malley and Widmier contacted a uniformed officer to determine his intentions indicating that they were waiting for Amy Fain and Sam Carter to check out. (Tr. 7:3-6) After waiting for additional uniformed officers O'Malley and Widmier proceeded to the room, after stopping at the front desk, and encountered Pam Fain, the mother of Amy Fain who was returning to the room. (Tr. 7:20-8:17)

Officer O'Malley testified that it was at least 1:00 PM when he came back from the front desk where he had gone to secure entry into the room, and that at that time entry had already been made into the room. (Tr. 8:17-24) O'Malley conceded that entry had been made into the room before 1:00 PM by three uniformed officers and Widmier. (Tr. 15:2-4, 16:7-9) When O'Malley entered the room Pam Fain and Amy Fain were present as well as a young child. (Tr. 9:1-5) Mr. Carter was in bed covered with a jacket. (Tr. 9:1-5) Uniformed officers arrested Amy Fain. O'Malley

ordered Carter to leave the room having ascertained that arrangements had not been made to rent the room for another night. (Tr. 10:13-17)

Significantly, no one from the hotel had asked O'Malley to clear the room. (Tr. 10:18-20)  Widmier confirmed he and O'Malley intended to search the room after it had been vacated.  (Tr. 37:21-23)

O'Malley and Widmier allowed Sam Carter to dress after his clothing was searched. (Tr. 10:21-11:1)  Sam Carter inquired if the police had a warrant, was advised that they had not, but was given the choice of leaving without clothing or possessions or consenting to search of those items prior to being forced to leave.  (Tr. 10:21 et seq.)

While in the process of evicting Sam Carter from the room, Widmier observed drug paraphernalia in a drawer of a nightstand. (Tr. 11:2-11:18)O'Malley testified that he observed Sam Carter reach in the nightstand and grab property that upon forcibly being removed from his hand proved to be several gold rings and a plastic vial with a red cap containing what O'Malley observed to be white residue in it. (Tr. 11:18-12:2)

O'Malley and Widmier then secured the room and allowed Sam Carter to leave with the clothing he was wearing and a baseball hat and jacket after it was searched. (Tr. 12:19-13:1)

Though O'Malley and Widmier fully intended to search the room and forced Carter to leave in order to do so, they testified

-5-

that they would not have observed either the drug paraphernalia or vial with residue in it if it had not been exposed to them by Carter. (Tr. 12:3-18)

O'Malley testified that he does not routinely tell people when to check out of a hotel room, and further that he did not have management authority to remove Mr. Carter from his possession of his room. (Tr. 25:15-17)

Officer O'Malley conceded he did not have probable cause to arrest Sam Carter. (Tr. 26:11-17)  O'Malley candidly indicated that Sam Carter was allowed to leave with only his pants, shoes, hat and perhaps jacket. (Tr. 27:8-11, 15-17).  When asked by the court why O'Malley and Widmier did not leave the room to allow Carter to pack up his things and leave, the officer responded clearly that he hoped to secure evidence of drug use, ostensibly secure permission or consent to search if something suspicious was encountered, all the while removing Carter from the room. (Tr. 28:2-23)

Officer Widmier testified that he was working with O'Malley and they were conducting surveillance of the Comfort Inn on January 9, 2001 from approximately 10:00 or 10:30 PM.  (Tr. 31:17-21).  Widmier testified that the only reason he and O'Malley continued to occupy the room was to make sure Carter was going to leave.  (Tr. 33:2-8)

Widmier testified that Sam Carter was lying on the bed sleeping when he entered the room.  (Tr. 35:1-3)  Widmier

-6-

testified that after Amy Fain was arrested and removed, he and O'Malley had no legitimate reason to be in the room having no request or authority from the management of the Comfort Inn to remove him. (Tr. 35:8-11)

> Q    And there was no -- you had no request from the hotel or anybody in management to have Mr. Carter removed from the premises, did you?
>
> A    No, we didn't.
> (Tr. 35:8-11) [1]

The State rested, and the defense called Judith D. Tonkovich, the clerk-cashier at the Comfort Inn on January 9, 2001. (Tr. 39:12 *et seq.*)

Ms. Tonkovich testified that that Sam Carter was a guest at the hotel on January 9, 2001. (Tr. 40:13-15)  Ms. Tonkovich confirmed that there was never any direction by her to remove anyone from the room occupied by Sam Carter, and that it was not uncommon for people to extend their stay after checkout.  (Tr. 45:18-46:1).  On examination by the court, Ms. Tonkovich testified that she never indicated to Officer O'Malley or anyone in the room that they had to be out by 1:00 (Tr. 49:10-50:15),specifically noting the following in her conversation with O'Malley:

---

[1] O'Malley at trial *sua sponte* testified in a contradictory fashion indicated that "Check out was 1:00 o'clock and nobody had come down to pay for the room so, before we went up, they had said, "They need to leave." (Tr. 157:1-3)

...Mr. O'Malley, had called me and --uh-- and asked me
that -- who was in the room, I said there was a Sue
Covington and --uh-- --uh-- if there were going to be
-- actually... I don't know. It's all in between
the officer calling me, first of all, and asked me
who was in there and I said, "Sue Covington." And
there could be other people in there and he had
called and said when are they due out, to check out?
And I said, "They're due out at 1:00 o'clock." And -
-uh-- "Was there other people in there?" And I said,
"Well, as far as I know -- I don't know right now but
I will call and see if they're staying over or
whatever." And --uh-- that's about all I could say
right there.

Q    Okay. So what happened after that?

A    So he had called me back and asked, you know, who was
in there. As far as I knew, there was.....

Q    Okay. What happened after that, though? After you
said you didn't know if the other people were in
there and that you'd call and see if they were
staying over.

A    I just called and there was a gentleman that
answered.

Q    Okay.

A    And --uh-- I believe he said it was Sam but that's
all. And I -- I -- you know, it's -- it's a little
ways back to remember it but...

Q    Right. So did, at that time, he tell you he wasn't
checking out or did you talk to him about checking
out at all?

A    **They -- they said that they would let me know.** (Tr.
49:10-50:15, emphasis added)

The record is clear that Sam Carter was staying at the

Comfort in with the full permission of the management and in fact

had the right to extend his stay, as he had done in the past, at

the time he was forced from his room and his belongings searched.

(Tr. 54:3-7)

At the conclusion the court entered an oral order denying

the motion to suppress.

THE COURT: All right. Thank you. I find the
following facts by a preponderance. On January 5th two

adults checked into Room 231 at the Comfort Inn.  The room
was registered to Sue Covington.  They apparently paid for
one night and, then, paid again to re-up, in essence, on
the 6th, 7th and 8th.  On the morning -- on January 9th
Officer O'Malley received information through Sergeant
Roberts, who had talked with Trooper Acquistapace who had
contacted Mr. Carter and Ms. Fair -- I'm sorry -- Fain, Amy
Fain, at that room in the Comfort Inn.  Officer O'Malley
later verified that the people were still in the room from
the hotel desk clerk, Judy, and made a request that, when
the room was vacated that they be allowed to search the
room prior to any housekeeping and the Comfort Inn agreed
to that.  Officer O'Malley and Trooper Widmier went to the
Comfort Inn sometime around noon for surveillance.  They
had lunch after that and later came back, at which time
they -- I'm sorry -- Officer O'Malley recognized that Mr.
Carter's Suburban was still there and they were watching to
see who would leave the room, what they were carrying,
etcetera, before they went up to do their search after the
people vacated.  Independently of this, the troopers
arrived to arrest Amy Fain and Officer O'Malley and Trooper
Widmier assisted in that.  When they entered -- when
Officer O'Malley entered the room, which was after the
other people, Mr. Carter was lying on the bed and was
awake.  He apparently had been awakened when the officers
first entered the room.  The officers took Ms. Fain into
custody.  The child that was in the room went with her
mother, Pam Fain [sic], and the other officers all left,
leaving Officer O'Malley and Trooper Widmier in the room
with Mr. Carter.  At that point it was after 1:00 o'clock
but not much after.  Officer O'Malley told Mr. Carter that
he had to vacate the room, to pick up his -- to get his
clothes and to leave.  They remained in the room while Mr.
Carter was packing up and, along the way, asked consent to
search sweat pants and a baking soda box, which after some
discussion, Mr. O'Malley or Mr. Carter allowed.  As Mr.
Carter was packing up, he opened a nightstand drawer and
there were visible to Officer Widmier crack pipes,
syringes, various drug paraphernalia.  Mr. Carter had
before taken from that nightstand a folding knife.  Officer
Widmier stated that he had seen those things and Officer
O'Malley told him to drop the things that were in his hands
as he reached -- as Mr. Carter reached back in.  He didn't
for awhile until at least there was another request.  When
he did drop what was in his hands, both officers saw a vial
with a red top with white residue that appeared likely to
be cocaine.  And, in the other hand, gold rings.  After
that, they secured the room.  Mr. Carter left.  The
officers obtained a search warrant and came back and

-9-

searched the room and obtained all the evidence that is
used to prosecute this case.

        For a plain view search, the police have to make the
observation from a place they are entitled to be.  The
discovery has to be inadvertent.  The incriminating nature
of the object must be immediately apparent.  And it must be
non-pretextual.  I don't think this was a pretext.  I don't
see anyth-- any reason for that.  Clearly, the officers
didn't have to stay and could have left.  But they hoped
that they would be able to find something by Mr. Carter
giving consent along the way as they went about their
business.  They certainly had positioned themselves in a
place that they were likely to see anything that was in
plain view as he packed up.  And I'm somewhat concerned
about whether that makes it an inadvertent discovery.
However, on balance, given those historical facts, I find
that it is.  Certainly Mr. Carter did not have to open
anything.  He did not have to pack up anything.  And in
light of that, it seems to me that, on balance, it is
inadvertent.  The other significant question is whether or
not the police were in a place that they were entitled to
be.  They were not requested by the Comfort Inn to evict
Mr. Carter and, had Mr. Carter said earlier when he was
called that he had decided to stay another night, he would
have still been the valid -- in valid possession of the
apartment or -- not apartment -- hotel room despite the
fact that he wasn't the registered guest.  However, at the
point that they they are there after 1:00 o'clock, Mr.
Carter hasn't done anything that would allow him to
maintain control of the place.  He was not a registered
guest and, in light of that, it seems to me that the
officers had a right to be where they were.  That was --
which was with the consent of the Comfort Inn to search the
place after the guests were no longer entitled to be there,
although -- and Mr. Carter had no right to be there after
1:00 o'clock, although he hadn't checked out.

        As a result of that, I'll deny the motion to
suppress. (Tr. 62:1-64:14)


        The trial courts misplaced reliance on Mr. Carter being in

his room after 1:00 PM was the basis for a motion for

reconsideration and the filing of an exhibit that established

that it was before 1:00 PM when O'Malley and Widmier ordered

Carter to leave his room. (Exc. 16, Exc. 20, Exc. 22). The trial
court denied reconsideration by written order on April 5, 2001
(Exc. 23), and on the record at calendar call on that date. (Tr.
67:5-21).


ARGUMENT:


It is basic that a search and seizure without the benefit of
a warrant is *per se* unreasonable and, absent narrowly defined
exceptions to the warrant requirement, all evidence so seized,
and any derivative evidence, must be suppressed.

> All evidence obtained as a direct or indirect result of
> this constitutional violation must be suppressed unless
> the state can show an attenuation between the
> unconstitutional conduct and the incriminating
> evidence. Dunaway v. New York, 442 U.S. at 216, 99
> S.Ct. at 2258, 60 L.Ed.2d at 838; Wong Sun v. United
> States, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d
> 441, 453-54 (1963); Cruse v. State, 584 P.2d 1141,
> 1145 (Alaska 1978). Waring v. State, 670 P.2d 357,367
> (Alaska 1983)

This basic tenant has long been a cornerstone of
constitutional protections in the United States, and has been
repeatedly affirmed, on both Federal and State grounds by the
Alaska Supreme Court.

> Although opinions of the Supreme Court of the United
> States, which we are bound to follow, in the area of
> search and seizure have been characterized as a maze or
> a `quagmire', there is a `polar star' which has been
> used as a starting point for analysis in most cases.
> The starting point is the United States Supreme Court's
> preference for search warrants in all cases on the

ground that interposing an orderly procedure whereby a
neutral and detached magistrate makes the decision is
far better than allowing those engaged in the
competitive enterprise of ferreting out crime to make
hurried decisions which are reviewable by hindsight
judgment.  While the fourth amendment prohibits only
unreasonable searches, this court has repeatedly
cautioned that a search without a warrant is *per se*
unreasonable unless it clearly falls within one of the
narrowly defined exceptions to the warrant requirement.
Erickson v. State, 507 P.2d 508,514, (Alaska 1973)
Footnotes omitted

The state has the burden of proof on all exceptions to the

warrant requirement.

A question has been raised regarding the quantum of
proof which the state must produce to meet its burden
of proof. The United States Supreme Court has not
addressed this point with regard to searches and
seizures.  However, in Lego v. Twomey, 404 U.S. 477,
487-89, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), the court
ruled that the government must prove the voluntariness
of confessions by a preponderance of the evidence.  The
Ninth Circuit has used the `preponderance' test in
cases where the government sought to justify searches
and seizures on grounds other than consent.  See United
States v. Marshall, 488 F.2d 1169, 1186 (9th Cir.
1973); United States v. Cales, 493 F.2d 1215, 1216 (9th
Cir. 1974).  In the present case, the state does not
claim that Schraff consented to the search. Indeed, the
undisputed facts make it abundantly clear that
appellant was in no condition to `freely and
voluntarily' consent to anything.  See Schneckloth v.
Bustamonte, 412 U.S. 218, 222-24, 93 S.Ct. 2041, 36
L.Ed.2d 854 (1973).  Since the consent exception to the
warrant rule is unargued and inappropriate, we conclude
that the state must convince us by a preponderance of
the evidence that its conduct satisfies some exception
to the warrant requirement.  With these principles in
mind, we proceed to an analysis of the case at bar.
Schraff v. State, 544 P.2d 834, 838, (Alaska 1975)
(Footnotes omitted)

The state standard mirrors the long history of Federal case law and the importance of the threshold of one's home.  In U. S. v. Shaibu 920 F.2d 1423 (9th Cir. 1990) the court noted:

> A warrantless search of a house is *per se* unreasonable, Payton v. New York, 445 U.S 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2nd 639 (1980), absent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment.

As the United States Supreme Court stated in Payton:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

This language is quoted in Steagald v. Unites States, 451 U.S. 204, 212, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38, 45 (1981)  In State v. Speitz, 531 P.2d 521, 525, (Alaska 1975) the court noted:

> The home has traditionally been afforded special protection under the Fourth Amendment of the United States Constitution and under the Alaska constitution. A door of the home represent a firm constitutional barrier whether or not it is open.  (See also Sumdum v. State, 612 P.2d 1018, 1021 (Alaska 1980)

The rationale as stated in Shaibu is based on Fourth Amendment terms establishing "The right of the people to be secure in their houses ….shall not be violated."

> That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505,511, 81 S.Ct 679, 682 (emphasis added)

The state, which has the burden of proof on this issue, has presented no recognizable exigent circumstances justifying the continued occupation of the room after the arrest of Amy Fain.

> Since the state has the burden of establishing consent, we must conclude that it has failed in carrying that burden. Sleziak v. State, 454 P.2d 252, 257-58 (Alaska 1969).

Taylor v. State 642 P.2d 1378 (Alaska App. 1982), is illustrative of the application of these principals to similar circumstances. In Taylor a non-consensual entry (yielding to the apparent authority of a police officer) was not justified by the need for a protective search:

> We do not believe that the record supports the conclusion that the police entry into the residence and the act of following David Taylor down the hall was justified by a protective search. Although the Alaska Supreme Court has recognized the protective search exception to the requirement that law enforcement officers should not conduct searches without a warrant, the court has said that the exceptions to the warrant requirement should be narrowly drawn. State v. Spietz, 531 P.2d 521, 525 (Alaska 1975); Mattern v. State, 500 P.2d 228, 231 (Alaska 1972). We conclude that to allow the protective search exception to the warrant requirement to be defined as broadly as the state asks us to in this case would substantially erode the warrant requirement. Taylor v. State, 642 P.2d at 1381

All subsequently derived evidence was suppressed in Taylor, as it must be in this case.

> All evidence obtained as a direct or indirect result of this constitutional violation must be suppressed unless the state can show an attenuation between the unconstitutional conduct and the incriminating

evidence. <u>Dunaway v. New York</u>, 442 U.S. at 216, 99
S.Ct. at 2258, 60 L.Ed.2d at 838; <u>Wong Sun v. United
States</u>, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d
441, 453-54 (1963); <u>Cruse v. State</u>, 584 P.2d 1141,
1145 (Alaska 1978).

In addition, the United States Supreme Court has recognized
that hotel rooms as well as dwellings fall within the protections
of the fourth amendment.  See <u>Stoner v. California</u> 376 U.S. 483,
84 S.Ct. 889, 11 L.Ed.2d 856.

The State has made no showing that any of these factors
justifies a warrantless occupancy and search.  The State
apparently sought to rely on the consent of the hotel management,
consent of Mr. Carter, or plain view to justify its search.
There is no factual basis supporting reliance on any of these
exigencies.

Any reliance by the state on consent as an exigent
circumstance justifying deviation from the warrant requirement is
misplaced both factually and legally in this case.  There simply
cannot be consent to search when police instructed Carter to
leave a room he had a legal right to occupy.  It is critical to
note, and it is undisputed, that any consent by hotel management
given in this case was conditioned, as it had to be, upon the
occupants having vacated the room.  The trial court's acceptance
of this condition having been met, based on the police evicting
Sam Carter from a room where he had a right to be, is simply an
extreme exercise in judicial tunnel vision.

Moreover, with regards to consent in <u>Robinson v. State,</u> 578

P.2d 141(Alaska 1978), our Supreme Court stated:

> In order to show that voluntary consent to search was
> obtained, the state must show that the consent was
> unequivocal, specific, intelligently given and
> uncontaminated by duress or coercion.
> ...
> Robinson was confronted with the *fait accompli* of the
> officers' presence; he did not indicate his consent in
> any way except by silence.  We have held that consent
> is not lightly to be inferred.  If we were to hold that
> Robinson's failure to demand that the officers leave
> amounted to consent, it would mean that consent could
> be inferred from slight, rather than preponderating,
> circumstances. Id at 144.

The trial court's conclusion that Sam Carter's consent

ultimately lead to plain view of contraband ignores the fact that

Carter was being forced to leave a room he lawfully occupied.  It

is patently coercive when police solicit an alleged voluntary

consent in order to allow Carter to get dressed prior to being

forced out of his hotel room.

The court found significance in the fact that it was after

checkout time when O'Malley and Widmier were in the room securing

purported voluntary consent from Sam Carter in order that he

could dress before being forced from the room.  (Tr. 65:9-12)

The court's conclusion as to the time are clearly mistaken

as Officer Olson's testimony establishes that Amy Fain had been

removed from the room and was in fact in the patrol vehicle prior

to 12:55 PM. (Tr. 287:13-288:12)

The refusal to accept this evidence submitted with the motion for reconsideration is unwarranted. (Tr. 67:5 *et seq*) When Officer O'Malley erroneously testified at the evidentiary hearing that it was after 1:00 PM when he instructed Sam Carter to vacate the room it, was proper for Carter's counsel to submit evidence of the actual time with a motion for reconsideration.

The record is uncontradicted that police had no authority to remove Sam Carter, had no request to do so from the management of the hotel, and that Sam Carter had routinely extended his stay at the hotel by contacting and paying the management. (Tr. 40:13-15, Tr. 45:18-46:1)) The trial court accepted as appropriate, the promise to allow police to search the room **after it had been vacated** as authority to force Mr. Carter to vacate. (Tr. 62:1-64:14) This is error.

II.  ***The court erred in not excusing a juror, when an alternate was readily available, who expressed, knowledge, compassion and friendship with a critical witness in the case.***

STANDARD OF REVIEW:

The standard of review for refusal to grant a challenge for cause is normally an abuse of discretion.

> A trial court's failure to grant a challenge for cause
> based on a claim of potential bias is reviewed for
> abuse of discretion and will be reversed "only in
> exceptional circumstances and to prevent a miscarriage
> of justice." Dalkovski v. Glad, 774 P.2d 202, 205

-17-

    MR. STEPOVICH:  .....that she has a -- she has a
state of mind that could affect her verdict and that's
the concern.
    THE COURT:  Well, she.....
    MR. STEPOVICH:  She's saying she can maybe
distinguish between Amy -- if we were to say that Amy
was going to testify, then I think she would say, "No."
    THE COURT:  She might but that's not the case.
    MR. STEPOVICH:  No.
    THE COURT:  Okay.  Response.
    MR. BURGLIN:  She seemed reluctant but she also
seemed like she was okay with sitting through it so
I.....
    THE COURT:  Okay.  I'm going to keep her here.  I
will ask her at the conclusion of Pam Fain's testimony
or before you rest, once more, whether she thinks she
can keep them straight.  That's what you're getting.
Let's go back in.
    MR. STEPOVICH:  Okay.  Your Honor, can I just put on
the.....(Tr. 265:11-269:11)

Trooper Olson testified extensively about Amy Fain's legal

difficulties (Tr. 272 et seq.), and the report that she was under

the influence of or using alcohol or drugs. (Tr.274:1-3)  Trooper

Olsen testified to the family relationship between Amy Fain, Pam

Fain and Pam Fain's drug usage on the day of the unlawful search.

(Tr.277:24-279:6)

Trooper Olson testified that there were no drugs in plain

view when he entered the room at the Comfort Inn (Tr.281:6-12).

Amy Fain appeared to Trooper Olson to be under the influence of

narcotics. (281:23-283:3)  The highly emotional nature of the

arrest and the impact on Amy Fain's son was detailed by Trooper

Olson.  (Tr. 286:10-287:12).  Trooper Olson's tape recording of

the event establishes that Amy Fain had been arrested and had

been removed from the room by approximately 12:50 PM, having